Filed 5/28/25  In re J.M. CA4/2

*See concurring opinion.*

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E084265 |
| Plaintiff and Respondent, | (Super.Ct.No. J300308) |
| v. | OPINION |
| D.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Tom Bunton, County Counsel, Helena Rho, Deputy County Counsel for Plaintiff and Respondent.

At the disposition hearing pertaining to J.M. (Minor), the juvenile court bypassed reunification services for Minor's mother, defendant and appellant D.M. (Mother), because Mother inflicted severe physical harm on Minor (Welf. & Inst. Code,[1] § 361.5, subd. (b)(6)(A)), and because Mother failed to reunify with Minor's half sibling, D.J. (§ 361.5, subd. (b)(10)(A)).  In regard to the infliction of severe physical harm (§ 361.5, subd. (b)(6)(A)), Mother asserts substantial evidence does not support the finding that she intentionally harmed Minor.  As to the failure to reunify with D.J. (§ 361.5, subd. (b)(10)(A)), Mother contends the juvenile court abused its discretion in deciding reunification services would not serve Minor's best interests.  We affirm.

## FACTS

A.     <u>BACKGROUND</u>

Mother has three children who are half siblings:  Minor, D.J., and M.E.  In March 2024, Mother was 38 years old.  Mother has been drinking alcohol since she was a teenager.  M.E., who was 19 years old in March 2024, told the Department social worker that Mother "has had a substance abuse issue[] since [M.E.] was a small child."  In 2012, Mother was convicted of driving under the influence of alcohol and causing injury to another person.  (Veh. Code, § 23153, subd. (a).)

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

2

B.     PRIOR CASE:  D.J. AND M.E.

Mother's daughter, D.J., was born in July 2013.  Mother was convicted of sale or transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)) and assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)).  Mother was incarcerated from March 2020 to December 2022.  On March 20, 2020, plaintiff and respondent San Bernardino County Children and Family Services (the Department) detained D.J. from Mother.  The juvenile court found true the allegations that D.J. was at risk of harm due to Mother's substance abuse, possession of drugs, and domestic violence.  (Welf. & Inst. Code, § 300, subd. (b)(1).)

Mother was granted reunification services in July 2020.  In March 2021 the juvenile court found Mother "failed to participate regularly and make substantive progress in [her] court-ordered case plan."  The juvenile court terminated Mother's reunification services.  "The case closed with [D.J.] being placed in the custody of [her] father."

M.E. was removed from Mother's custody at the same time as D.J.  M.E.'s juvenile dependency case was closed with her being placed in her father's custody.

Starting in April 2022, as part of Mother's incarceration, she participated in the "Custody to Community Transition Re-Entry Program."  While in that program Mother was "very hardworking and dedicated to her recovery, in substance use."  As part of the program, Mother tested negative for drugs, attended weekly counseling sessions, and participated in 26 hours of 12-step meetings, relapse prevention classes, and parenting classes.  Mother completed the program in December 2022.

3

C.	CURRENT CASE:  MINOR

Minor was born in late December 2023.  On March 6, 2024, Mother "drank approximately three (3) . . . Mike's hard lemonade[s] and she took 'some shots of Fireball.'  Mother admitted that at approximately 6 AM on March 7, 2024, she took two (2) additional shots of Fireball."

On March 7, 2024, at approximately 10:00 a.m., Mother called her 19-year-old daughter M.E.  "[M.E.] could tell [Mother] had been drinking."  Mother was "hysterical" and admitted she dropped Minor.  M.E. called 911 and requested a welfare check for Minor.  When police arrived, Mother smelled strongly of alcohol and "was exhibiting signs of an unknown substance."  The signs Mother displayed included eyelid tremors, fixed pupils that were unresponsive to light, an inability to focus and answer basic questions, and staring into the distance as though she was unaware police were present.

Police observed "open and closed alcohol[ic] beverages everywhere" including "near the baby bottles and formula."  Mother admitted to police "that she dropped the baby from her arms."  Minor's father, who was not in the room when Minor fell, said that Mother told him Minor had " 'slipped through the blanket' and fell onto the vinyl flooring."  Mother gave the same explanation of the fall to the Department social worker.  At other times, Mother denied dropping Minor and claimed he had rolled off the bed.  Paramedics transported Minor to the hospital where doctors found he had an approximately 3-inch-long skull fracture.  There did not appear to be long-term physical consequences of the fracture.

In a forensic medical report concerning Minor's skull fracture, Dr. Mark Hilado wrote that Minor suffered a "skull fracture with overlying soft tissue swelling. These findings are caused by blunt force trauma to the head and may be consistent with the reported history of [Minor] being dropped from standing height onto hardwood flooring, however inflicted trauma cannot be ruled out."

At the jurisdiction hearing, the juvenile court found true the allegations that: Mother "inflicted nonaccidentally" "serious physical harm including a skull fracture" (§ 300, subd. (a)); Mother's substance abuse places Minor at risk of harm (§ 300, subd. (b)(1)); and while in Mother's care, Minor had "suffered serious physical harm including a skull fracture" (§ 300, subd. (b)(1)).

During the disposition hearing, when applying the severe harm provision for bypassing reunification services (§ 361.5, subd. (b)(6)(A)), the juvenile court noted Dr. Hilado's opinion that Minor may have been dropped, but that "inflicted trauma cannot be ruled out." The juvenile court said, "With conflicting information from the mother and no concrete evidence of how the child was injured and the changing story of the mother as to what took place, [the] Court is finding that the (b)(6) bypass provision does apply to the mother; that there was severe physical abuse to the child. [¶] Based on Dr. Hilado's opinion that the injury is consistent with blunt-force trauma, [the] Court is finding there has been a deliberate injury inflicted to the child's body by the mother, based on her actions."

**DISCUSSION**

    A.    <u>SEVERE HARM</u>

Mother contends the juvenile court erred in bypassing services under the severe harm provision (§ 361.5, subd. (b)(6)(A)) because substantial evidence does not support the finding that Minor's injury was caused by an intentional infliction of abuse.

Reunification services can be bypassed when the child had been adjudicated a dependent due to "the infliction of severe physical harm to the child . . . as defined in this subdivision." (§ 361.5, subd. (b)(6)(A).) "A finding of the infliction of severe physical harm, for the purposes of this subdivision, may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body . . . by an act or omission of the parent." (§ 361.5, subd. (b)(6)(C).)

The juvenile court adjudicated Minor a dependent because Mother "inflicted nonaccidentally" "serious physical harm including a skull fracture." " 'Nonaccidental' generally means a parent or guardian 'acted intentionally or willfully.' " (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.) Thus, there is a jurisdictional finding that Mother intentionally harmed Minor. Mother does not take issue with that jurisdictional finding.

In examining Mother's contention, we conclude there would be little point in addressing it for two reasons: First, if we reversed the bypassing of services under the severe harm provision, then reunification services would remain bypassed under section 361.5, subdivision (b)(10), because we conclude *post* there was no error in applying that provision. Second, if we concluded Mother did not act intentionally for purposes of section 361.5, subdivision (b)(6)(A), there would still be a jurisdictional finding in the

6

record that she acted intentionally (§ 300, subd. (a)).  Because a discussion of Mother's

intention, or lack of intention, would provide no practical relief, we decline to discuss it

further.  (*In re D.P.* (2023) 14 Cal.5th 266, 276 [an issue is moot when effective relief

cannot be granted].)

      B.     HALF SIBLING

         1.     *CONTENTION*

Mother contends the juvenile court erred in bypassing reunification services.
(§ 361.5, subd. (b)(10)(A).)

         2.     *LAW*

A juvenile court may bypass reunification services for a parent when "the court

ordered termination of reunification services for any siblings or half siblings of the child

because the parent or guardian failed to reunify with the sibling or half sibling after the

sibling or half sibling had been removed from that parent or guardian pursuant to

Section 361 . . . and that, according to the findings of the court, this parent or guardian

has not subsequently made a reasonable effort to treat the problems that led to removal

of the sibling or half sibling of that child from that parent or guardian."  (§ 361.5, subd.

(b)(10)(A).)

There is "a two-step, burden-shifting procedure for bypassing reunification

services under subdivision[] (b)(10)."  (*In re Jayden M.* (2023) 93 Cal.App.5th 1261,

1272.)  In the first step, the Department bears the burden of proving the failure to

reunify with the half sibling.  (*Ibid.*)  If the Department meets its burden, then, in the

7

second step, the burden shifts to Mother to prove that it is in Minor's best interests for Mother to receive reunification services.  (*Ibid.*; § 361.5, subd. (c)(2).)

### 3.  *THE FIRST STEP*

Mother concedes that her "failure to reunify with [Minor's] half-sibling [D.J.] was sufficiently documented."  We accept the foregoing quote as a concession that the Department met its burden in the first step.

### 4.  *THE SECOND STEP*

#### a.  The Law

Mother bore the burden of proving that reunification services would serve Minor's best interests.  Factors relevant to that analysis include:  "(1) the parent's ' " 'current efforts and fitness,' " ' (2) the parent's ' " 'history,' " ' (3) the ' " 'gravity of the problem' " ' that led to the assertion of dependency, (4) the ' "strength of the bonds" ' between the child and the parent and between the child and the current caregiver, and (5) the ' " 'child's need for stability and continuity.' " '  [Citation.]  One factor that is essential—and hence necessary—to the assessment of a child's best interest is whether there is ' "some 'reasonable basis to conclude' " ' that reunification is possible; if it is not, offering reunification services that are destined to fail is not in the child's best interest."  (*In re Jayden M., supra,* 93 Cal.App.5th at pp. 1272-1273.)  We apply the abuse of discretion standard of review.  (*Id.* at p. 1273.)

#### b.  Mother's History

We begin with the second factor—Mother's history.  Mother was 38 years old when she dropped Minor.  Mother has been drinking alcohol since she was a teenager,

8

which means she has been drinking for at least 20 years. Mother's history includes a conviction for driving under the influence causing injury to another person, and having M.E. and D.J. removed from her custody. Thus, Mother has a decades-long history of alcohol-related problems.

Mother admitted to using methamphetamines and cocaine as a teenager but denied being addicted to them. In 2012, Mother was convicted of sale or transportation of methamphetamine. (Health & Saf. Code, § 11379, subd. (a).) In 2024, when Mother dropped Minor, she "was exhibiting signs of an unknown substance." The signs Mother displayed included eyelid tremors, fixed pupils that were unresponsive to light, an inability to focus and answer basic questions, and staring into the distance as though she was unaware police were present. Mother admitted to taking medication prior to dropping Minor. There were multiple medications on a nightstand in Mother's bedroom.

#### c.　Gravity of the Problem

The next factor is the gravity of the problem. In 2012, Mother was driving drunk and injured another person. Mother consumed multiple alcoholic beverages on March 6, 2024, and then resumed drinking liquor at 6:00 a.m. on March 7, 2024. Mother dropped Minor around 10:00 a.m. on March 7, 2024. Mother's problem with alcohol is severe, as she has been drinking for decades, is still drinking to excess, and continues to cause injuries to others due to her drinking.

In addition, Mother mixed alcohol with medication or illegal drugs. Mother admitted to taking medication on the morning she dropped Minor, and she was

9

exhibiting signs of being under the influence of a substance other than alcohol. Mother's severe alcohol problem is aggravated by her polysubstance abuse.

### d. Current Efforts and Fitness

We now turn to the first factor—Mother's current efforts and fitness. Due to dropping Minor, Mother was in jail from March 7 to March 23, 2024. In random drug tests on April 23, May 1, 13, and 23, and June 12 and 27, 2024, Mother tested negative. On June 27, 2024, Mother completed three months of outpatient treatment. Mother participated in 12-step meetings, early recovery skills/addiction education, relapse prevention classes, and individual counseling.

The foregoing is duplicative of Mother's addiction treatment in 2022. From April to December 2022, Mother tested negative for drugs, attended 12-step meetings and classes on relapse prevention, and participated in weekly individual counseling sessions. Given that Mother immediately relapsed in 2024, as soon as she was off parole and not pregnant, the foregoing brief services are insufficient to resolve Mother's decades-long substance abuse issues.

Mother's counselor from her 2024 outpatient services, Ms. Fonesca, testified at the disposition hearing. Fonesca met with Mother eight times. Mother did not tell Fonesca that she had a history of abusing substances other than alcohol. Fonesca opined that it is important for a person in recovery "to take accountability for their use of substances." Mother and Fonesca made a treatment plan for Mother that included treating Mother's anxiety. Mother made progress in therapy by decreasing her symptoms of anxiety.

10

Mother's failure to be honest with Fonesca about the extent of her substance abuse does not bode well for the treatment plan's success. One can reasonably conclude that if a plan does not address all aspects of the problem, then portions of the problem are likely to remain. Thus, Mother's current efforts are insufficient to resolve Mother's substance abuse problems, thereby rendering Mother unfit to parent.

e.      Bonds

We move to the fourth factor—the strength of the bonds. Mother told a Department social worker that "she loves [Minor] with all of her heart, and she would never purposely cause harm to him." Minor's caregiver is his paternal aunt who "is very attentive to [Minor's] needs" and who "stated that he is joy to have placed in her home." It appears that both Mother and the caregiver share strong bonds with Minor.

f.      Stability and Continuity

We turn to the fifth factor—the child's need for stability and continuity. Minor was removed from Mother's home before he was one year old. It is unclear what impact that removal had on Minor, but he will need a parent for at least 17 more years.

g.      Conclusion

In sum, Mother has a decades-long substance abuse problem that has led to all her children being removed from her care, Minor being injured, a car accident causing an injury, and Mother's incarceration. Mother's current efforts to resolve her substance abuse issues are repetitive of past unsuccessful efforts and they fail to address the full scope of her substance abuse. Due to the substantial problem and the inadequate efforts to resolve it, Mother failed to demonstrate that reunification is possible. The juvenile

11

court did not abuse its discretion in concluding that providing reunification services would not be in Minor's best interests.  Therefore, the juvenile court did not err in bypassing reunification services under section 361.5, subdivision (b)(10)(A).

**DISPOSITION**

The disposition order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

Acting P. J.

I concur:

CODRINGTON

J.

MENETREZ, J., Concurring.

The juvenile court bypassed D.M. (Mother) under Welfare and Institutions Code section 361.5, subdivisions (b)(6) and (b)(10). (Unlabeled statutory citations are to this code.) Mother challenges the bypass finding under subdivision (b)(10) of section 361.5 on the ground that she made reasonable efforts to treat the problems that led to the removal of J.M.'s half siblings. She also argues that granting her reunification services would be in J.M.'s best interest under subdivision (c)(2) of section 361.5. Both arguments lack merit, and I accordingly concur in the judgment.

First, the record contains ample evidence that Mother has a long history of substance abuse, which was a central issue in both J.M.'s case and the half siblings' case. Since the removal of the half siblings, Mother has made the following efforts to treat that problem: (1) In 2022, at the end of a period of incarceration, Mother completed the "Custody to Community Transitional Re-Entry Program," which is "a residential program focused on reducing recidivism through targeted evidence based interventions"; (2) in June 2024, Mother completed three months of outpatient substance abuse treatment; and (3) Mother submitted to a number of drug tests from April to early July 2024.

The evidence in the record does not indicate that the program in 2022 was a substance abuse treatment program. Rather, it was a general program "to prepare clients to successfully re-enter the community" upon their release from incarceration. Substance

1

abuse was one topic among many addressed, but there is no evidence that the program was a substance abuse treatment program.

The program in 2024, in contrast, does appear to be a substance abuse treatment program, but the evidence in the record does not indicate that Mother had completed it by the time of J.M.'s disposition hearing. Rather, the certificate in the record states only that Mother completed three months of treatment—it does not state that she completed the program. The progress reports from the program do not identify a completion date, and one of the progress reports shows that Mother submitted to a drug test in July 2024, indicating that treatment was ongoing after her completion of the first three months.

In sum, there is no evidence that Mother ever completed a substance abuse treatment program between the removal of the half siblings in July 2020 and the removal of J.M. at disposition in July 2024. And there is no evidence that she even enrolled in such a program until after J.M. was detained in March 2024. Against that background, Mother's submission to some drug testing after J.M. was detained does little to show that she made reasonable efforts to treat her substance abuse problem. For all of these reasons, substantial evidence supports the juvenile court's finding by clear and convincing evidence that Mother failed to make reasonable efforts to treat the problems that led to the removal of J.M.'s half siblings.

Second, the juvenile court declined to find that "reunification is in the best interest of the child" under subdivision (c)(2) of section 361.5. Thus, because "Mother is challenging the juvenile court's failure to make a finding that would have been required in order *not* to bypass her," the question before us is "'whether the evidence compels a

finding in favor of the appellant as a matter of law,' that is, whether the evidence supporting Mother's position 'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*In re Raul V.* (2022) 82 Cal.App.5th 290, 300-301.)

Mother cannot make that showing on this record. Mother's substance abuse caused her to lose custody of J.M.'s half siblings years ago, but Mother did not even enroll in a substance abuse treatment program until after J.M. was detained. At that point, her longstanding and severe substance abuse problem had led her to mishandle two-month-old J.M. so badly that he suffered a fractured skull. And because J.M. was only two months old when he was detained, there had been little time for him to develop the kind of bond with Mother that would weigh heavily against bypass. Given all of those facts, the evidence in the record was not of such a character and weight as to compel a finding that reunification would be in J.M.'s best interest. Mother's argument therefore fails.

For all of the foregoing reasons, Mother has not shown that the trial court erred by bypassing reunification services under subdivision (b)(10) of section 361.5. I therefore concur in the judgment.

MENETREZ                    
J.

3